My name is Hillary Hahn, and I'm appearing on behalf of the petitioner, Marvin Nidoy. And if I may, I'd like to reserve two minutes for rebuttal. Are you the only one arguing on this case? Yes, I am. Okay. A little louder, please. Sure. I think that in reviewing this case, it's important to begin with the purpose of the equitable estoppel doctrine. The Supreme Court described estoppel as an equitable doctrine invoked to avoid injustice in particular cases. And we believe that under the facts of this very unique case, the government should be estopped from deporting Mr. Nidoy to the Philippines. And we think what makes this case particularly egregious and what makes it distinguishable from other equitable estoppel cases that courts have considered in the immigration context is that the immigration officer in this case, Mr. Brady, repeatedly and falsely assured Mr. Nidoy's representative that Mr. Nidoy would not be deported from the United States if he pled guilty to this assault charge. And as we've outlined in our briefs, Mr. Nidoy meets all four of the traditional elements of equitable estoppel. So what I'd like to do is just turn to the magistrate judge's findings and talk about those in brief. Really, she relied on two different grounds for finding that he did not meet his burden. And I want to start just by talking about a related issue, which is Mr. Brady's credibility. The magistrate judge found that the witnesses testified candidly about the recollection and perception of the events as they now remember them. The government argues that based on this, that the magistrate judge made a finding explicitly that Mr. Brady was a credible witness. And we think that's wrong for two essential reasons. First — Isn't the trial judge the judge of the credibility of the witnesses? Yes, she is. And, I mean, there's two points here. I mean, first of all, we don't think that that was an explicit credibility finding, because when you view the decision as a whole, the magistrate judge adopted the — Mr. Nidoy's version of the facts and applied the law of equitable estoppel to those facts, not to the facts of Mr. Brady. The accounts that Mr. Brady and Mr. Nidoy gave were entirely divergent about these conversations. They agreed that there were conversations between Mr. Brady and Mr. Murilla, but beyond that, that's it. I mean, Mr. Murilla testified, Mr. Nidoy's representative testified, that during those conversations, Mr. Brady repeatedly assured him that Mr. Nidoy would not be deported. What motive would he have to do that? Well, it's hard to know, Your Honor, and that's — It knowingly misrepresents something if you want to prove a problem or the basis for a problem. What motive would this agent have for trying to deceive this fellow into pleading guilty? Well, I mean, unfortunately, we're not clear about the motive here. You know, there's been a lot of testimony in the case that Mr. Brady was the sole immigration officer on all of Kodiak Island. He had a lot of power. He was somebody who adjudicated benefits applications. He was somebody who arrested people and put them in deportation proceedings. I don't disagree with you that there are inconsistencies in Brady's testimony, that, you know, all of that was fleshed out. But if the judge that heard it resolved it in favor of, you know, basically, well, against your client, aren't you asking us to do something that, as an appellate judge, we can't do? I mean, you want us — you know, now, I mean, I see all the inconsistencies. And if I had been there, maybe I would have done it differently. But here, I'm not seeing the witnesses. I'm not seeing the same thing. You know, isn't that what you're asking me to do? Well, two things about that, Your Honor. I mean, first is, I don't think it — I mean, the judge's finding was that both Mr. Brady and Mr. Murilla testified candidly. I mean, I think on that — on the face of it, it's contradictory. I don't think you can find that both parties testified candidly. But beyond that, I mean, getting more to your question, I don't think that her finding, even under a clearly erroneous standard, was supported by the evidence, just because of all the inconsistencies. And I think that, in particular, I think the inconsistency that stands out — That's what the trial — the trier of facts is supposed to do, isn't it, resolve the inconsistency? That's true. I mean, she didn't do that in this case. I mean, she didn't — she didn't talk about any inconsistency whatsoever in the — in Mr. Brady's testimony, even though there are many of them. And beyond that, when we objected to the report and recommendation, the district court judge simply adopted it. He didn't address those either. So, I mean, you know, if the concern is about an explicit credibility finding, I think it might be appropriate in this case to remand it to the magistrate judge and ask her to actually make explicit credibility findings with regard to each witness, because I think in that case it would be a lot easier for the court to review those. I mean, it — Here's the other problem, though, that you face, just even assuming you can get over that. How do you get over the third prong of equitable estoppel, that Ndoye must demonstrate that he was ignorant of the true facts regarding the situation as a result of the representations of Agent Brady? Ndoye has a lawyer. His lawyer tells him, don't do it. And it boiled down to a choice for Ndoye of who he wanted to trust, Agent Brady, his advice from — which was what came through Murilla, or his own lawyer, Thielen, who told him, don't do it. Right. Well — So how does he get — I mean, he knows, you know, he's picking between some sort of inconsistency, and he decides to go with what he wants. How does he satisfy that prong? Well, I mean, a couple of things. I mean, the first thing is that — you know, the question is, what are the true facts in this case? Because we're arguing that he was ignorant of them. The true facts in this case is that Mr. Ndoye, because of this plea, he was going to be put into deportation proceedings, ineligible for any kind of relief from deportation. He would be ordered deported, removed from the United States, and be ineligible under the immigration law to ever come back to the United States as an immigrant. But there's also a true fact. His lawyer, Thielen, told him, don't do it. Well, he told him that he would be subject to deportation. And this Court is well aware, given the number of immigration cases that it sees, there's a big difference between saying you might be subject to deportation and the true facts in this case. I mean, if you're subject to — But how can a lawyer ever tell you you will be deported? I mean, you won't — you're not deported until you're deported. I mean, subject to deportation. I could go out to four lawyers, and two could say, well, this is what might happen, this is what might happen. But, you know, the fact of whether you're deported or not doesn't happen until it happens. Right. Well, I mean, I think that subject to — He knows there's a risk because his lawyer, Thielen, tells him. I mean, there's no question that he knew there was a risk. But, you know, a longtime permanent resident like Mr. Ndoye is often eligible, even if they're in deportation proceedings, for relief from removal. There are a lot of waivers available to people who — But it's the classic roll of the dice. I mean — Well, I don't think so. I mean, I think the testimony in this case is pretty clear that he — you know, had he known that he was going to be automatically deported because of this conviction. I mean, an aggravated felony conviction dooms you, essentially. That he wouldn't have — that he would have gone to trial, and he wouldn't have, you know, rolled the dice. I think the other point that's important here is that even after Mr. Ndoye talked to Mr. Thielen, Mr. Murillo went back to Mr. Brady. And he said, you know, my — the attorney is saying that he might be subject to deportation. And Mr. Brady said, don't worry about it. He won't be deported because he has the community support. And so I think, essentially, his — Mr. Brady's advice kind of superseded the advice of his attorney. And, you know, as far as, like, you know, reasonableness of what he should believe, it's certainly reasonable for him to believe the immigration officer. Well, or why — but we also believe what — if someone told you you had cancer and another person told you you didn't have cancer, you know, I think we would have a preference towards one as opposed to the other. Right. Well, it's kind of a question of, you know, if a doctor told you you had cancer versus a layperson telling you, you know, this looks like my cancer. Do you want to save two minutes? I will. Thank you. All right. Ma'am, please. I'm Tad Seder from the U.S. Attorney's Office on behalf of the IRS. Good morning. Good morning. If we could just focus for a moment on the last thing that Mr. Hahn said. He said it depends. Do you listen to the layperson or do you listen to the doctor? And I think the inference was that you'd listen to the doctor if it was a cancer diagnosis. Well, here, as Your Honor pointed out, he had a choice. He could listen to an experienced public defender who said unequivocally, you will be subject to deportation if you take this deal. I don't care what anyone else says. You will be subject to deportation or a well-meaning layperson with no legal training who is speaking to him through an interpreter. Well before Britney Spears, Simon Garfunkel said, a man hears what he wants to hear and disregards the rest. And that's exactly what this case is about. And if you look at the record at ER 130-131 and ER 200-201, you'll see the evidence of that. After the guilty plea, Ms. Offerman ran into Mr. Brady in a restaurant, and she said, how's it going? Is everything fine? And Brady said, yeah, he's fine. Nito is fine. Don't worry about him. And Mr. Hahn asked, did you know that he was fine? And Brady said, no, I know he's in immigration detention, and I know that if you're in immigration detention, you're treated well. That's what he meant. That was his testimony at 130-131. What Ms. Offerman said is, I asked, do you think we're doing fine here? And Mr. Brady assured me we were doing fine. He received the documents that he wanted, and everything was great. So the word fine, depending on who's listening to it, means two very different things here. Is this one of those, the crime that he pled to, is that one of those that required automatic deportation? Removal, is it? Your Honor, there's no, as Judge Callahan noted, there's no such thing as deportation until you're on the plane, sometimes not even then. Why is the agent telling him that he's going to get letters of support from the community and everything if the removal is automatic? What the agent says is, don't plead guilty to Assault 1, first of all, because you're gone. You must plead guilty to a lesser charge. And Mr. Murilla is a layperson, and he was not able to answer questions regarding the subtle distinctions between the four levels of assault in Alaska. The lawyers answered those questions. But Mr. Ndoye had one last opportunity to avoid removal, and that was requesting prosecutorial discretion. He asked the INS director down here in Seattle for discretion. They provided all the letters, all the community support. There was a contrary declaration from his mother-in-law saying this guy can't be removed soon enough as far as I'm concerned, and that was his last opportunity to avoid deportation. But in answer to your question, pleading guilty to Assault 2nd Degree or B under the Alaska system, if it's a crime of violence and if it's going to be for over a year, as the prosecutor, Mr. Gray, testified it would likely be, then deportation is not automatic but a relatively certain result. Well, would the letters of support, could they have done him any good? Would the director, I don't know, I'm not an expert on immigration law, so that's obvious. But would the director have thought, oh, this guy's got a lot of community support, would he have the discretion not to deport him? Absolutely, Your Honor. In this case, there is a declaration. It's either Exhibit 7 or 8, I can't remember which, and it's a gentleman who was present at the church when Mr. Ndoye's supporters came and said, we've got a problem, we're going to pass this declaration around. But was it sort of slim and none and slim left town? Yes, Your Honor. Ndoye's never set foot in the church before or after,  But it doesn't really matter, because as Your Honor pointed out, you can't get the third element of equitable stop on this case. Mr. Ndoye cannot possibly show that he was ignorant of the true facts, because his public defender told him the true fact. He chose to ignore that fact, and that's his right, and that's his opportunity. But he chose to ignore that fact. The other problem is the legal standard. When equitable estoppel is asserted, you have to have clear, cogent, and convincing evidence. When equitable estoppel is asserted against the government, you go up to the next level. You've got to show affirmative misconduct. You've got to show a deliberate act. And as Your Honor pointed out, there's no motive here. There is absolutely no motive. In fact, Ms. Offerman says at ER-206-07, I have no beef with Mr. Brady. I have never had a problem with Brady previously or since. Mr. Brady, it's in the record, assisted Mr. Ndoye's mother and sister to become citizens. There is simply no motive for this gentleman to go out on a limb and deliberately mislead this gentleman, which is not what occurred. Equitable estoppel against the government, high standard. Against the INS, even higher, because the courts presume that the INS has expertise in this area. And inexplicably, the case didn't get cited in the table of authorities, and I apologize. That's the Kowalski case, 245 F3rd at 1143-1150, Kowalski 245 F3rd. But that's the problem at the hearing. But we have a day-and-a-half evidentiary hearing. Judge Tyler hears all the evidence. She hears all the witnesses. We've got people testifying by phone. We've got declarations coming in over hearsay objections. My objection is the witness is here, a declaration is there for hearsay. Judge Tyler says, eh, let's let it all in. Everything came in. Every piece of evidence offered came in. Every witness who was available testified. And she found that there was a miscommunication. She made a credibility finding. She said, everyone's credible here, they just miscommunicated. So the next hurdle is clear error. And it's not just Judge Tyler. Senior Judge Thomas Zille signed the report and recommendation. He's a very careful man. He read what she said, which was very carefully written, and he signed it. So we have to show clear error by Senior Judge Zille, or Your Honors have to jump into the shoes of the cold of the judge, go back to the cold record, and try to make a credibility determination. And that's simply inappropriate for this panel in the government's opinion. I wrote down in my notes he rolled the dice because that's exactly what he did. He had a choice. He didn't like the choice. It's a bad choice. You're sitting in jail. You've stabbed somebody twice in the neck and almost killed them. And your choice is to plead guilty and possibly get removed or go to trial, and you're going to probably lose. It's not a good choice. Why is he in that situation? Because he jumped up and stabbed someone. He didn't fight with his fists. He didn't find another way to defuse the situation. This is a young man who has made a series of bad choices. And his last one was to ignore his public defender and listen to the third-hand hearsay from a friend. As Judge Tyler said at ER 230, far from a situation of egregious or affirmative misconduct, however, the Court finds that this is an extremely unfortunate case involving a series of miscommunications and mistaken assumptions. Unless there are any questions, I'm done. Thank you. Thank you. Just a couple of points. The first is getting back to that third prong of the test. Mr. Cedar talks about the experienced public defender who Mr. Ndoye was relying on. Well, that experienced public defender was a criminal attorney by his own admission, not an immigration attorney and not an expert in immigration. On the one hand, he has advice that he might be subject to deportation from this person. On the other hand, he's faced with the person in Kodiak Island who puts people into removal proceedings, telling him that he won't be deported. I think that it's clear, given that choice, that he was not he was not he did not know what exactly the true facts of this case were. I just wanted to get back to the point about discretionary relief or prosecutorial discretion. Under the immigration law, there is no relief whatsoever from removal if you have been convicted of an aggravated felony. If you're one exception is if you can show that you'd be tortured in your country of citizenship. But what Mr. Cedar is talking about is prosecutorial discretion. And that's something that, you know, certainly the attorney general can always choose not to deport somebody who's been ordered removed. But that's something that would be entirely within the government's province to do. And the only person who would know about that would be Mr. Brady himself. Finally, just because this is equitable estoppel against the government, that doesn't mean that there's a different legal standard. The legal standard is still clear, convincing evidence. But the affirmative misconduct is just another prong that we have to show. And there's no motive requirement. I mean, again, we wish that we had a motive for Mr. Brady's conduct, but we just don't. Thank you. Thank you. This matter will stand. The matter of Marvin Ndoi v. Immigration and Naturalization Service will stand submitted at this time. We'll call the next matter.
judges: Hall, Callahan, Bertelsman